JIM McNEFF, INC. *v.* TODD ET AL.

No. 81–2150.   Argued January 17, 1983—Decided April 27, 1983

BURGER, C. J., delivered the opinion for a unanimous Court.

*James T. Winkler* argued the cause for petitioner. With him on the briefs was *Steven D. Atkinson.*

*Wayne Jett* argued the cause for respondents. With him on the brief was *Julius Reich.**

---

*\*Richard P. Markey* filed a brief for Associated Builders and Contractors Inc. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Lee, Deputy Solicitor General Wallace, Barbara E. Etkind,* and *T. Timothy Ryan, Jr.,* for the United States; by *J. Albert Woll, Laurence J. Cohen, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations et al.; by *Denis F. Gordon* for the National Coordinating Committee for Multiemployer Plans; by *John H. Stephens, George M. Cox,* and *Michael Futch* for the Carpenters

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve conflicts in the Circuits as to whether monetary obligations that have accrued under a prehire contract authorized by § 8(f) of the National Labor Relations Act, 73 Stat. 545, 29 U. S. C. § 158(f), can be enforced, prior to the repudiation of such a contract, in a suit brought by a union against an employer under § 301 of the Labor Management Relations Act, 61 Stat. 156, 29 U. S. C. § 185, absent proof that the union represented a majority of the employees.

I

Petitioner is engaged in the construction industry and, in September 1978, was a subcontractor on a jobsite in southern California. The general contractor was contractually bound to the Master Labor Agreement negotiated between the International Union of Operating Engineers, Local No. 12, and the Southern California General Contractors Associations. The Master Labor Agreement provided that work at the jobsite was to be performed only by subcontractors who had signed a labor agreement with the Union.[1] The Master Labor Agreement also contained a union security clause requiring covered employees, including those of subcontrac-

---

Trust Funds for Southern California et al.; and by *Daniel L. Stewart* for the Loyola of Los Angeles Law Review.

[1] Article IV, § D, of the agreement provides:

"The Contractor agrees that neither he nor any of his subcontractors on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work (including quarries, rock, sand and gravel plants, asphalt plants, ready-mix concrete plants, established on or adjacent to the jobsite to process or supply materials for the convenience of the Contractor for jobsite use), except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement." App. 39.

tors, to become members of the Union.[2]   At the time petitioner began work on the jobsite as a subcontractor, it was not a signatory to a labor agreement with the Union and none of its employees on the jobsite were members of the Union.

On September 13, 1978, petitioner's president, McNeff, was approached on the jobsite by a representative of the Union who informed him that in order to remain on the project he was required to sign the Master Labor Agreement.   McNeff refused.   Later that day, the Union representative returned with a representative of the general contractor who also informed McNeff that he was required to sign the agreement in order to remain on the project.[3] McNeff then signed the agreement on behalf of petitioner.[3] Petitioner's employees signed union cards that same day.

The Master Labor Agreement required petitioner to make monthly contributions to fringe benefit trust funds on behalf of each covered employee.[4]   From October 1978 through

---

[2] Article II, §§ D and E, of the agreement provide:

"D. Employees employed by one or more of the Contractors for a period of eight (8) days continuously or accumulatively under the work jurisdiction of a particular Union as that term is defined herein shall be or become on the eighth (8th) day or eight (8) days after the effective date of this Agreement, whichever is later, members of such Union and shall remain members of such Union as a condition of continued employment.   Membership in such Union shall be available upon terms and qualifications not more burdensome than those applicable at such times to other applicants for membership to such Union.

"E. The Contractor shall discharge any employee pursuant to the foregoing section upon written notice from the Union of such employee's nonpayment of initiation fees or dues."   App. 38.

[3] Specifically, petitioner entered into an agreement that adopted the Master Labor Agreement "in its entirety," with certain exceptions that are not relevant to this case.   *Id.,* at 9–13.

[4] The agreement provides:

"The undersigned employer by his signature acknowledges receipt of a true and correct copy of the Agreement establishing the Operating Engineers Trusts:

"AND, further by his signature, accepts all of the terms and conditions of said Trust Agreements and agrees to be bound thereto in every way,

March 1979 petitioner submitted required monthly reports to the trust funds, but made no contributions. Each form was submitted by petitioner with the false notation that "no members of this craft were employed during this month." In November 1978, after petitioner had filed the first of such reports, respondents, the trustees of the funds, requested permission from petitioner to audit its records to verify the statements made in its monthly report. Petitioner purported to agree, but postponed the audit several times. On April 4, 1979, respondents brought this suit under § 301 of the Labor Management Relations Act, 29 U. S. C. § 185,[5] to compel an accounting and payment of any contributions found to be due the trust funds. An audit performed in pretrial discovery proceedings revealed that petitioner had five employees covered by the agreement during the period October 1978 through March 1979 and therefore owed a total of $5,316.79 in trust fund contributions for that period.

The District Court for the Central District of California granted respondents' motion for summary judgment and ordered payment of the unpaid trust fund contributions. The Court of Appeals for the Ninth Circuit affirmed. 667 F. 2d 800 (1982).

---

including the obligation to make periodic contributions and payments pursuant to the requirement of the Board of Trustees consistent with said Trust Agreements and the Collective Bargaining Agreement between said employer and Local 12, International Union of Operating Engineers." *Id.*, at 12–13.

The record shows that McNeff initialed petitioner's acceptance of the following trust fund obligations: (1) pension trust; (2) health and welfare trust; (3) vacation-holiday trust; (4) apprentice trust; (5) journeyman training trust; and (6) industry fund trust. *Id.*, at 13.

[5] Section 301(a) provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 61 Stat. 156.

We granted certiorari, 458 U. S. 1120 (1982), in part to resolve Circuit conflicts on this issue,[6] and we affirm.

## II

By authorizing so-called "prehire" agreements like that at issue in this case, § 8(f) of the National Labor Relations Act, 29 U. S. C. § 158(f), exempts construction industry employers and unions from the general rule precluding a union and an employer from signing "a collective-bargaining agreement recognizing the union as the exclusive bargaining representative when in fact only a minority of the employees have authorized the union to represent their interests." *NLRB* v. *Iron Workers*, 434 U. S. 335, 344–345 (1978) *(Higdon)*. See *Garment Workers* v. *NLRB*, 366 U. S. 731, 737–738 (1961). Section 8(f) provides in pertinent part:

> "It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this Act prior to the making of such agreement . . . : *Provided* . . . That any agreement

---

[6] Compare *Washington Area Carpenters' Welfare Fund* v. *Overhead Door Co. of Metropolitan Washington*, 220 U. S. App. D. C. 273, 681 F. 2d 1 (1982); 667 F. 2d 800 (CA9 1982) (case below); *W. C. James, Inc.* v. *Oil, Chemical & Atomic Workers International Union*, 646 F. 2d 1292 (CA8 1981); *New Mexico District Council of Carpenters* v. *Mayhew Co.*, 664 F. 2d 215 (CA10 1981); and *Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan* v. *Associated Wrecking Co.*, 638 F. 2d 1128 (CA8 1981), with *Laborers District Council of Alabama* v. *McDowell Contractors, Inc.*, 680 F. 2d 94 (CA11 1982), and *Baton Rouge Building & Construction Trades Council* v. *E. C. Schafer Construction Co.*, 657 F. 2d 806 (CA5 1981).

which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 9(c) or 9(e)." 73 Stat. 545.

Thus, § 8(f) allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under § 9 of the Act. One factor prompting Congress to enact § 8(f) was the uniquely temporary, transitory, and sometimes seasonal nature of much of the employment in the construction industry. Congress recognized that construction industry unions often would not be able to establish majority support with respect to many bargaining units. See S. Rep. No. 187, 86th Cong., 1st Sess., 55–56 (1959), 1 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 451–452 (Leg. Hist.). Congress was also cognizant of the construction industry employer's need to "know his labor costs before making the estimate upon which his bid will be based" and that "the employer must be able to have available a supply of skilled craftsmen for quick referral." H. R. Rep. No. 741, 86th Cong., 1st Sess., 19 (1959), 1 Leg. Hist. 777. See generally, *Higdon, supra,* at 348–349.

We first addressed the enforceability of a § 8(f) prehire agreement in *Higdon.* In response to the employer's violation of a prehire agreement, the minority union in that case picketed the employer for more than 30 days without filing an election petition. The National Labor Relations Board concluded that such picketing violated § 8(b)(7)(C). Section 8(b)(7)(C) was intended to ensure voluntary, uncoerced selection of a bargaining representative by employees; unless a union is the certified representative of the employees in the relevant unit, it prohibits picketing to force an employer "to recognize or bargain with a labor organization as the representative of his employees." In *Higdon,* we affirmed the Board's view that a prehire agreement does not make a union

the "representative of [an employer's] employees" as that language is used in § 8(b)(7)(C):

> "[Absent] majority credentials . . . , the collective-bargaining relationship and the union's entitlement to act as the exclusive bargaining agent had never matured. Picketing to enforce the § 8(f) contract was the legal equivalent of picketing to require recognition as the exclusive agent, and § 8(b)(7)(C) was infringed when the union failed to request an election within 30 days." 434 U. S., at 346.

## III

We did not decide in *Higdon* whether prehire agreements are enforceable in a § 301 action. There is a critical distinction between an employer's obligation under the Act to bargain with the representative of the majority of its employees and its duty to satisfy lawful contractual obligations that accrued after it enters a prehire contract. Only the former obligation was treated in *Higdon*.[7]

In upholding the Board's view that a union commits an unfair labor practice by picketing to enforce a prehire agreement before it has attained majority status, we noted in

---

[7] In *Higdon*, we addressed the question whether holding a prehire contract to be unenforceable in a § 301 suit would be contrary to *Retail Clerks* v. *Lion Dry Goods, Inc.*, 369 U. S. 17 (1962). In *Lion Dry Goods* the Court stated that § 301(a) confers jurisdiction on the federal courts to entertain suits on contracts between an employer and a minority union, as well as suits on contracts between an employer and actual collective-bargaining agents. Section 8(f) contracts were noted as being within a federal court's § 301(a) jurisdiction. *Id.*, at 29. In *Higdon*, we merely noted that "[i]t would not be inconsistent with *Lion Dry Goods* for a court to hold that the union's majority standing is subject to litigation in a § 301 suit to enforce a § 8(f) contract . . . and that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable." 434 U. S., at 351–352. This statement was intended to show that the question of jurisdiction under § 301 is different from the question of enforceability of a prehire agreement in a § 301 action. We did not decide the latter question.

*Higdon* that this view protects two interests that Congress intended to uphold when it enacted § 8(f). First, our holding in *Higdon* protects the § 7 rights of employees to select their own bargaining representative.[8] To be sure, § 8(f) affects the § 7 rights of employees by allowing a minority union to reach an agreement with the employer setting the terms and conditions of employment. This is the direct and intended consequence of § 8(f) and, in any event, is limited by the final proviso in § 8(f) that permits employees—and other parties mentioned in §§ 9(c) and (e) of the Act—to challenge a prehire agreement at any time by petitioning the Board for a representative election. If, however, an employer could be compelled by picketing to treat a minority union as the exclusive bargaining agent of employees, the § 7 rights of those employees would be undermined to an extent not contemplated by Congress. As we noted in *Higdon*, 434 U. S., at 338, a union that is the certified representative of the employees in the relevant unit does not commit an unfair labor practice under § 8(b)(7)(C) by picketing to compel compliance with a collective-bargaining agreement. Consequently, freeing a minority union from the confines of § 8(b)(7)(C) would grant that union power otherwise accorded only to certified bargaining representatives chosen by a majority of the affected employees. It is up to those employees to decide what organization, if any, will enter into a collective-bargaining agreement on their behalf and have the consequent right to engage in picketing, if necessary, to enforce it; the union signatory to a

---

[8] Section 7 of the Act, 29 U. S. C. § 157, guarantees employees the right to bargain collectively through representatives of their own choosing. Section 9(a) of the Act, 29 U. S. C. § 159(a), provides that the bargaining agent for all employees in the appropriate unit must be the representative "designated or selected for the purposes of collective bargaining by the majority of the employees . . . ." It is an unfair labor practice for an employer under §§ 8(a)(1) and (2) and for a union under § 8(b)(1)(A) to interfere with, restrain, or coerce employees in the exercise of their right to select their representative. See generally *Garment Workers* v. *NLRB*, 366 U. S. 731 (1961).

prehire agreement cannot arrogate such power to itself until it "successfully seeks majority support." *Higdon, supra,* at 350.

Second, our decision in *Higdon* promotes Congress' "intention . . . that prehire agreements were to be arrived at voluntarily . . . ." *Higdon,* 434 U. S., at 348, n. 10. In accord with this intention, we approved the Board's conclusion that a "prehire agreement is voidable" "until and unless [the union] attains majority support in the relevant unit." *Id.,* at 341. Allowing the union to picket to enforce a prehire agreement before it attains majority status is plainly inconsistent with the voidable nature of a prehire agreement.

The concerns with the § 7 rights of employees to select their own bargaining representative and our fidelity to Congress' intent that prehire agreements be voluntary—and voidable—that led to our decision in *Higdon* are not present in this case. Union enforcement, by way of a § 301 suit, of monetary obligations incurred by an employer under a prehire contract prior to its repudiation does not impair the right of employees to select their own bargaining agent. Unlike the situation in *Higdon,* enforcement of accrued obligations in a § 301 suit does not mean that the union represents a majority of the employer's employees. In a § 301 suit, the District Court merely enforces a contract entered into by the employer—a contract that Congress has legitimated to meet a special situation even though employees themselves have no part in its negotiation or execution. Such enforcement does not grant the plaintiff union a right otherwise enjoyed only by a majority union except in the very narrow sense, expressly intended by Congress, that employers and minority unions in the construction industry do not violate the Act by entering into prehire agreements. There is no sense in which respondents' contract action has a recognitional purpose like that forbidden in *Higdon.*

Neither does respondents' § 301 action trench on the voluntary and voidable characteristics of a § 8(f) prehire agree-

ment.  It is clear in this case that petitioner entered into the prehire agreement voluntarily.[9]  Moreover, although the voidable nature of prehire agreements clearly gave petitioner the right to repudiate the contract, it is equally clear that petitioner never manifested an intention to void or repudiate the contract.  For the relevant period of time,[10] the record shows conclusively that petitioner accepted the benefits of the prehire agreement and misled the union of its true intention never to fulfill its contractual obligations.  Whatever may be required of a party wishing to exercise its undoubted right to repudiate a prehire agreement before the union attains majority support in the relevant unit, no appropriate action was taken by petitioner to do so in this case.[11]  Consequently, respondents' suit does not enervate the voluntary and voidable characteristics of the prehire agreement.

---

[9] There is no merit to petitioner's claim that it was coerced into entering the agreement.  Petitioner was simply informed that the general contractor on the jobsite was bound by a union signatory subcontracting clause in its collective-bargaining agreement with the Union.  That clause required petitioner to enter into a similar agreement with the Union if it wanted to stay on the jobsite.  Such clauses are lawful under the construction industry proviso of § 8(e) of the Act, 29 U. S. C. § 158(e).  As we said in *Woelke & Romero Framing, Inc.* v. *NLRB*, 456 U. S. 645 (1982), whatever pressures petitioner complains of as a result of the union signatory subcontracting clause are "implicit in the construction industry proviso." *Id.*, at 663.  Petitioner cannot rely on such "pressure," made lawful by the construction industry proviso, to support its contention that it entered the prehire agreement at issue in this case involuntarily.

[10] The only time period relevant to this case is that between September 13, 1978 (the date the prehire agreement was entered into), and April 26, 1979 (the date respondents' § 301 suit was filed).  The District Court entered judgment for respondents for the trust fund obligations incurred by petitioner for this period of time only.  App. to Pet. for Cert. 10–11.  Respondents did not appeal the amount of their recovery.

[11] It is not necessary to decide in this case what specific acts would effect the repudiation of a prehire agreement—sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipitating a representation elec-

Apart from not offending the concerns noted in *Higdon*, allowing a minority union to enforce overdue obligations accrued under a prehire agreement prior to its repudiation vindicates the policies Congress intended to implement in § 8(f). Congress clearly determined that prehire contracts should be lawful to meet problems unique to the construction industry. However limited the binding effect of a prehire agreement may be, it strains both logic and equity to argue that a party to such an agreement can reap its benefits and then avoid paying the bargained-for consideration. Nothing in the legislative history of § 8(f) indicates Congress intended employers to obtain free the benefits of stable labor costs, labor peace, and the use of the union hiring hall.[12] Having had the music, he must pay the piper.

By the same token, the union cannot simply accept the employer's performance under a prehire contract without upholding its end of the bargain. Neither party is compelled to enter into a § 8(f) agreement. But when such an agreement is voluntarily executed, both parties must abide by its terms until it is repudiated.[13]

## IV

A § 8(f) prehire agreement is subject to repudiation until the union establishes majority status. However, the monetary obligations assumed by an employer under a prehire

---

tion pursuant to the final proviso in § 8(f) that shows the union does not enjoy majority support.

[12] Petitioner received another benefit not expressly contemplated by Congress. Here, the Union had a collective-bargaining agreement with the general contractor requiring that work at the jobsite was to be performed only by subcontractors who had signed an agreement with the Union. See n. 1, *supra*. Thus, the direct consequence of petitioner's entering into the prehire agreement was to enable petitioner to remain on the job.

[13] We need not consider in this case whether considerations properly cognizable by a court under § 301 might prevent either party, in particular circumstances, from exercising its option under § 8(f) to repudiate a prehire agreement before the union demonstrates majority status.

contract may be recovered in a § 301 action brought by a union prior to the repudiation of the contract, even though the union has not attained majority support in the relevant unit. There having been no repudiation in this case, the judgment of the Court of Appeals is

*Affirmed.*