**PAINTERS LOCAL UNION NO. 164 OF the BROTHERHOOD OF PAINTERS, et al., Plaintiffs-Appellees,**

v.

**James L. EPLEY, etc., Defendant-Appellant.**

No. 84–3183.

United States Court of Appeals, Eleventh Circuit.

July 12, 1985.

Allan P. Clark, Jacksonville, Fla., for defendant-appellant.

Frank E. Hamilton, III, Tampa, Fla., for plaintiffs-appellees.

Before RONEY and CLARK, Circuit Judges, and SIMPSON, Senior Circuit Judge.

CLARK, Circuit Judge:

This appeal stems from a dispute over the scope and duration of a § 8(f) union-employer prehire agreement, the application of such an agreement to a project by project employer, and the effect of an employer's repudiation of the prehire agreement. The district court order enforced the decision of a joint trade board and awarded Painters Local Union No. 164 (Local 164) a sum of $30,040.29 plus interest for fringe benefits, audit fees, and attorney's fees and costs. Suit was brought by Local 164 against James L. Epley, individually, and doing business as Epley Coatings and as Hisco Construction, pursuant to 29 U.S.C. § 185 and § 301 of the National Labor Relations Act (NLRA). The district court correctly defined the issue as one of "ascertaining whether the arbitrator was acting pursuant to [a] valid and existing agreement."

The district court filed an opinion on February 25, 1981, in which the court concluded, "[t]he parties' initial agreement, as a § 8(f) prehire agreement, was transformed into a collective bargaining agreement when the parties entered into their second agreement on or about May 1, 1976, the effective date of the agreement." Before entry of judgment on January 23, 1984, the appellant Epley urged the district court to reconsider its previous opinion and determination of liability in light of *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983). In

*McNeff* the Supreme Court implemented its previous opinion in *Higdon, infra,* and said the following:

> We did not decide in *Higdon* whether prehire agreements are enforceable in a § 301 action. There is a critical distinction between an employer's obligation under the Act to bargain with the representative of the majority of its employees and its duty to satisfy lawful contractual obligations that accrued after it enters a prehire contract. Only the former obligation was treated in *Higdon.*

103 S.Ct. at 1757 (footnote omitted). In finding prehire agreements enforceable in § 301 actions the Court limited its holding as follows:

> A § 8(f) prehire agreement is subject to repudiation until the union establishes majority status. However, the monetary obligations assumed by an employer under a prehire contract may be recovered in a § 301 action brought by a union prior to the repudiation of the contract, even though the union has not attained majority support in the relevant unit. There having been no repudiation in this case, the judgment of the Court of Appeals is [affirmed].[1]

103 S.Ct. at 1759. We conclude that the district court erred, that the evidence demonstrates that Epley repudiated the prehire agreement in May of 1978, and that Epley was not obligated to pay any fringe benefits thereafter to the union except on the project for which the original prehire agreement was entered.

## I. FACTUAL BACKGROUND

In the latter part of 1975 Epley, d/b/a Epley Coatings, made a bid on painting work for a construction project at Blount Island in Jacksonville, Florida. All subcontractors who performed work at Blount Island were required to sign local union working agreements in order to perform work for the general contractor at Blount Island.

Epley, d/b/a Epley Coatings, was awarded the job and pursuant to the terms of the project agreement, signed a working agreement with Local 164 which had an effective date of May 1, 1974, and was due to expire in 1976. Epley began its painting subcontracting work at Blount Island during December, 1975, and obtained employees directly from the Local 164 hiring hall to perform the work.

Local 164 also had a working agreement with the Painting and Decorating Contractors of America (PDCA), of which Epley was not a member. This agreement expired during 1976 and Local 164 entered into negotiations with PDCA for a new agreement. While these negotiations were going on Local 164 executed interim agreements with contractors who were not members of, nor had assigned bargaining rights to, the PDCA. Local 164 and Epley entered into an interim agreement on May 1, 1976, representing the second agreement between the two parties. By the terms of this interim agreement, Epley agreed to become a signatory to the PDCA agreement being negotiated, if and when it was executed. Local 164 and the PDCA subsequently reached an agreement with an effective date of June 1, 1976, and an expiration date of June 16, 1978. Though Epley refused to sign that agreement[2] he continued to use union supplied labor and paid the PDCA negotiated wages and fringe benefits for work performed on the Blount Island project.

Epley thereafter in April or May, 1978, formed Hisco Construction, a sole proprietorship, and entered a subcontract agreement with Tuttle-White Constructors, Inc. (Tuttle-White), the general contractor at the Westside Skills Center School for the Duval County School Board in Jacksonville.

---

1. This court's prior ruling in *Laborers District Council v. McDowell Contractors, Inc.,* 680 F.2d 94 (11th Cir.1982), was overruled by the Supreme Court to the extent it held that absent majority status the monetary obligations assumed by an employer under a prehire agreement could not be enforced.

2. The district court found, and we agree, that although Epley did not sign the PDCA agreement he was bound to its terms by virtue of the May 1, 1976 agreement.

Tuttle-White had accepted Epley's non-union bid and Hisco Construction began working on the project in May of 1978 on a non-union basis. Hisco Construction did not request employees from the Local 164 hiring hall, nor did it pay any fringe benefit contributions on behalf of its painting employees working on the Tuttle-White job to any of the funds established by Local 164, or in which Local 164 participated. It did continue to pay fringe benefits to the union for employees working on the Blount Island project. The fringe benefits at issue in this case relate solely to Hisco's employees on the Tuttle-White job.

In May of 1978, a confrontation occurred between the union and Epley/Hisco because the Tuttle-White job was being conducted with non-union employees. The union established a picket line at the job and it is clear from the record that Epley told the union that he was not going to use union labor at Tuttle-White. The exact date is unclear but it is certain that in May of 1978 Epley informed the union that he was repudiating the prehire agreement insofar as it might apply to the Tuttle-White job (*See* T. 49, 53–54 as to testimony of the union's business agent and T. 86, *et seq.* as to Epley's testimony).

In May of 1978, the union brought charges against Epley before the joint trade board alleging that he had violated Article II(D) of the 1976 PDCA agreement.[3] The two previous agreements Epley actually signed contained the same language.

The joint trade board found that the use by Epley of Hisco Construction as a non-union employer on the Tuttle-White project violated the agreement between the parties. The trade board ordered that an audit be conducted to determine if fringe benefits were due for the hours worked by Hisco employees. Epley refused to comply with the audit request and this suit followed.

## II. THE DISTRICT COURT'S RULINGS

The district court upheld the award by the joint trade board finding that the initial § 8(f) prehire agreement was transformed into a collective bargaining agreement when Epley and Local 164 entered into the second agreement on May 1, 1976. This ruling was based upon a factual finding that the six months preceding the May 1, 1976, agreement, when Epley was working at Blount Island, served as tacit support for the designation of Local 164 by the employees as their collective bargaining representative. This finding stemmed from evidence adduced at trial that on the Blount Island project Epley had hired exclusively from the Local 164 hiring hall, with most of the employees being union members and non-union members having signed authorization slips. The court found that there was sufficient time for the employees to voice their opposition to Local 164 or to voice their support for another bargaining representative, but no evidence was presented to that effect. Accordingly, the court held that the parties' second agreement was a valid collective bargaining agreement with a rebuttable presumption of majority representation by Local 164.

## III. THE ISSUES ON APPEAL

On appeal Epley raises three issues: (1) whether the initial agreement between Epley and Local 164 was transformed into a collective bargaining agreement when the parties entered into their second agreement on May 1, 1976; (2) whether a § 8(f) prehire agreement is only voidable during its term when it is the initial contract between the parties; and (3) whether Epley could be bound by the terms of the second agreement on the Tuttle-White project when the union had failed to establish its majority status at that job site. We find that the district court's opinion is contrary to *NLRB v. Local 103, International Association of Bridge Workers (Higdon)*, 434 U.S. 335, 98

---

**3.** Article II(D) provides in relevant part:
Employer party hereto shall not use any corporate or other operating device for the pur-
pose of violating his obligations under this agreement....

S.Ct. 651, 54 L.Ed.2d 586 (1978); *NLRB v. Haberman Construction Co.*, 641 F.2d 351 (5th Cir.1981) (en banc); and *McNeff, supra,* and accordingly reverse.

Prehire agreements under § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), exempt construction industry employers and unions from the general rule precluding a union and employer from signing "a collective-bargaining agreement recognizing the union as the exclusive bargaining representative when in fact only a minority of the employees have authorized the union to represent their interests." *Higdon,* 434 U.S. at 344, 98 S.Ct. at 657.

Section 8(f) provides in pertinent part: It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members ... because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement.... Provided ... That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

Section 8(f) permits construction industry employers and unions to reach agreements setting the terms and conditions of employment without the union's majority status first having been established as required by § 9 of the Act. One important factor considered by Congress in enacting § 8(f) was the temporary and transitory nature of employment in the construction industry. *See McNeff,* 103 S.Ct. at 1756. Congress enacted § 8(f) in recognition of the fact that unions in the construction industry would often be unable to establish majority support with respect to many bargaining units. *See* S.Rep. No. 187, 86th Cong., 1st Sess. 55–56 (1959), 1 Leg.Hist. 541–42, U.S. Code Cong. & Ad.News 1959, 2318. As for employers in the construction industry Congress recognized the need of the employer to know his labor costs in order to properly estimate a bid and the necessity of having an available supply of skilled labor for quick referral. *See* H.R.Rep. No. 741, 86th Cong., 1st Sess. 19 (1959), 1 Leg.Hist. 777, U.S.Code Cong. & Ad.News 1959, 2318. *See generally, Higdon, supra,* 434 U.S. at 348–49, 98 S.Ct. at 659.

In *Higdon,* the Supreme Court held that § 8(f) does not authorize picketing to enforce prehire contracts where the union has failed to establish majority status. *Higdon,* 434 U.S. at 346, 98 S.Ct. at 658. The facts in *Higdon* show that Higdon Construction Company reached a prehire agreement with the union on July 31, 1973, obliging Higdon to abide by the terms of the multi-employer understanding between Local 103 and the Tri-State Iron Workers Employers Association, Inc. At about that same time Higdon Contracting Company was formed to carry on construction work with non-union labor and undertook contracts in Kentucky and Indiana. The union picketed both job sites, one for more than 30 days without seeking a majority representation election at either site. The Local had not represented a majority of the employees at either of these sites. The Court held that § 8(f) does not "expand the duty of an employer under § 8(a)(5), which is to bargain with a *majority* representative, to require the employer to bargain with a union with which he has executed a prehire agreement but which has failed to win majority support in the covered unit." *Id.* (emphasis in original).

Our reading of *Higdon, supra,* decided in 1978, *Haberman, supra* (en banc) decided in 1981, and *McNeff, supra,* decided in 1983 leads us to conclude that an employer who enters into an area-wide prehire agreement with a union is liable to the union under the terms of the contract for all work done by the employer on any job site within the area, unless the contract is limited to a particular job site. However, the employer retains the right to repudiate the prehire contract at any time, except

where the union has established majority status at a particular project within the area covered by the contract. Here, Epley entered into a general PDCA contract without limitation to a particular job. *Higdon* mandates that such a prehire agreement is *voidable* by the employer and that such an agreement does not become a collective bargaining contract unless the union actually represents a majority of the employees in the relevant unit and is recognized as such by the employer. *Higdon*, 434 U.S. at 341, 98 S.Ct. at 655. *Haberman* makes the distinction between a "project by project" employer and an employer with a "stable work force." 641 F.2d at 367. It is clear from the record in this case that Epley was a "project by project" employer and we need not consider what our holding would be if Epley employed a stable work force.

Epley's principal contention on appeal is that the second agreement entered into between Epley and Local 164 on May 1, 1976, was only a successive prehire agreement, not a full-fledged collective bargaining agreement, and that pursuant to *Higdon* absent the union's establishment of majority status at the Tuttle-White site, Epley had no duty to honor or bargain under the § 8(f) agreement with respect to employees at that site.

■ The parties stipulated that the union did not represent a majority of the employees at the Tuttle-White job. Taking into consideration the holdings in *Higdon, Haberman,* and *McNeff, supra,* we conclude that Epley had the clear right to repudiate or avoid the area-wide prehire agreement as to projects not yet begun, or projects underway, where the union had failed to establish its majority status. Given the fact that the union did not represent a majority of the workers at the Tuttle-White project, and Epley's clear repudiation in May of 1978, we can only conclude that the district court erred in holding Epley liable for fringe benefits for work performed on the Tuttle-White site.

REVERSED.