**CITIES: MUNICIPAL CONTRACTS: ADVERTISING FOR CONSTRUCTION BIDS:**
City may include project labor agreement specifications if motivated by economic reasons as purchaser, and not in regulatory capacity.

707a
Cr. Ref. 63b-2; 469a-2

July 27, 1993

Mr. Joseph M. Boyle
City Attorney
City of International Falls
235 4th Avenue
International Falls. MN 56649

Dear Mr. Boyle:

In your letter you present substantially the following:

## FACTS

The City of International Falls is in the process of soliciting competitive bids for the construction of substantial additions to its municipal building and community building/library. The City Council is considering a request for a bid specification which would require that successful construction bidders enter into a prehire collective bargaining agreement with labor unions. as is common practice in the construction industry.

You then ask substantially the following:

## QUESTION

May a city soliciting competitive bids for a construction project require that construction bidders agree to enter into a lawful prehire collective bargaining agreement with building trade unions prior to the commencement of construction?

## OPINION

We answer your question in the affirmative. so long as the city is doing so for economic reasons as a purchaser of contractor services. and not in its regulatory capacity.

As you know, political subdivisions in Minnesota are required either by statute or home rule charter to award most construction contracts[1] to the "lowest responsible bidder." E.g. Minn. Stat. §§ 123.37, subd. 1 (school districts), 365.37, subd. 2 (towns), 375.21, subd. 1 (counties), and 412.311 (statutory cities). The purpose of the "lowest responsible bidder" requirement is to give "all contractors an equal opportunity to bid and [to ensure] to the taxpayers the best bargain for the least money." Griswold v. Ramsey County, 242 Minn. 529, 535, 65 N.W.2d 647, 649 (1954); Schwandt Sanitation v. City of Paynesville, 423 N.W.2d 59, 64 (Minn. Ct. App. 1988).

A necessary corollary of the rule has been the "lowest responsible bidder" requirement "that the plans and specifications be so framed as to permit free and open bidding by all interested parties. Coller v. City of St. Paul, 223 Minn 376, 384, 26 N.W.2d 835, 840 (1947). As the supreme court has explained:

> The basic purpose of competitive bidding is to give to the public the benefit of the lowest obtainable price from a responsible contractor. As a part of the fulfillment of that purpose. the discretion of public officials is limited or removed so as to avoid fraud, favoritism, and extravagance . . . . Essentially, the specifications must be so drawn as to give all bidders an equal opportunity without granting an advantage to one or placing others at a disadvantage.

Foley Bros., Inc. v. Marshall, 266 Minn. 259, 264, 123 N.W.2d 387, 391 (1963), see also Carl Bolander & Sons Co. v. City of Minneapolis, 451 N.W.2d 204, 206-07 (Minn. 1990); Johnson v. City of Jordan, 352 N.W.2d 500, 503-504 (Minn. Ct. App. 1984).

---

1. All counties, towns. cities, school districts or other political subdivisions authorized to enter into "contracts," which include all "agreement[s] entered into by a municipality for . . . the construction, alteration, repair, or maintenance of real or personal property" are governed by the uniform municipal contacting law, Minn. Stat. § 471.345 (1992). Subdivision 3 of that statute requires contracts for over $25,000 to be let  by sealed bids and awarded pursuant to the "law governing contracts by the particular municipality or class thereof." Id., subd. 3.

Consistent with that view, this office has previously opined that political subdivisions seeking bids for construction contracts may not specify that successful contractors agree to use only union workers on a project. Op. Atty. Gen. 707-A-4 (May 10, 1957); Op. Atty. Gen. 270-d (February 28. 1940). As the 1957 Opinion explains:

> Although there is authority to the contrary, it is the prevailing judicial view that a proposal or advertisement limiting bidders to those who agree to employ union labor, or to furnish goods bearing the union label, is invalid. There is no question that a contract by a municipal corporation for public work or a municipal ordinance or resolution requiring the party undertaking the performance of such work to use only union labor is void, and the same is true whether there is a statute requiring competitive bidding or not, the general rule being well settled that all contracts in which the public are interested which tend to prevent competition, where a statute or known rule of law requires competition, are void.

Op. Atty. Gen. 707-A-4, at 1 (May 10. 1957), quoting McQuillin on Municipal Corporations, § 29.48 at 428 (3d ed. 1971) (citations omitted).

That same opinion, however, emphasizes that, in determining the lowest responsible bidder on an individual project, a local government may consider labor relations issues before awarding the contract:

> In determining who is the lowest responsible bidder, the council may, in the exercise of its honest judgment and discretion, take into consideration facts such as the ability of the individual bidders to promptly and satisfactorily complete the contract with freedom from interference, as well as the financial responsibility of such bidders. It may be, therefore, in individual cases, that the award of a contract to a bidder who was not the lowest in amount would not be discriminatory but would be justified where it appears to the council that, due to favorable labor conditions or labor relations, such bidder is in a better position to assure the timely completion of the contract than is the lowest bidder.

Id. at 4 (emphasis added).

One method both public private owners interested in getting construction projects done on time and on budget have long utilized to assure peaceful working conditions is the so-called

"project labor agreement", where general contractors or construction managers enter into collective bargaining agreements with building and construction trade unions prior to any employees being hired. As a leading treatise describes the arrangement:

Project agreements: For large projects involving a considerable volume of construction at a single site (or interrelated group of sites) over a period of years, a special agreement will sometimes be negotiated. It may involve the owner of the project as well as his contractors, or it may be sought by the contractor at the owner's insistence. These agreements normally attempt to guarantee the progress of the work without interruption by strikes and to establish special mechanisms for dispute settlement; sometimes they provide means for determining wages and conditions at the projects. D. Quinn Mills, Industrial Relations and Manpower in Construction 40 (1972). The United States Department of Labor has likewise explained how the economic concerns of owners and contractors on large projects prompted the development of project labor agreements:

> [T]he project agreement developed as a response to problems peculiar to the construction industry. The typical local agreement seldom meets the needs of massive projects such as the construction of the St. Lawrence Seaway or the Alaska Pipe Line, which last for several years, pose special problems of manning and work rules, and involve huge sums of money, a consortium of several contractors, and a great deal of public interest and often public funds. Contractors on such projects, and their eventual owners, want continuity of production, more favorable treatment of costs such as travel and overtime pay than local agreements typically provide, uniform shift and other conditions for all trades and the help of national union officials experienced in securing manpower and administering agreements on large projects . . . For contractors and owners, one of the chief attractions of such agreements has been their recent inclusion of a clause promising no strikes for the duration of the project.

U.S. Department of Labor, Labor Management Services Administration, The Bargaining Structure in Construction: Problems and Prospects, at 14 (1980). See also M. Stakes, Labor

Law in Contractors' Language 195 (1983); C. Borda & R. Levitt, Union and Open-Shop Construction 107-08 (1980).

Project labor agreements typically include provisions such as the following:

-- recognition of the local building construction trades council and affiliated labor organizations as the exclusive bargaining representative for all craft employees on the project;

-- a union security clause, requiring all employees to become union members within seven days of their employment;

-- a commitment to rely primarily on designated union hiring calls for the project's skilled labor force;

-- a project-specific dispute resolution procedure;

-- a no strike/no lockout agreement for the duration of the project; and

-- a requirement that all contractors and subcontractors agree to be bound by the agreement.

It is our understanding that dozens of major public works projects in Minnesota have been completed under project labor agreements containing similar provisions, including the Hubert H. Humphrey Metrodome, the New University of Minnesota Hospital, the Minneapolis Waste-to-Energy Plant, the Minneapolis Convention Center, the Nicollet Mall project, the Hennepin County Government Center, the St. Paul Civic Center, the Ramsey County Courthouse renovation, and the Seneca, Blue Lake and Empire wastewater treatment facilities.[2]

---

2.    1977 Minn. Laws ch. 89, sec. 10, subd. 3(f) required the metropolitan sports facilities commission to execute "agreements with appropriate labor organizations and construction contractor organizations which provide that no labor strike or management lockout will halt, delay or impede construction." To our knowledge, the other facilities listed had no similar explicit legislative authorization.

From the beginning, the National Labor Relations Act (NLRA) accepted those prehire agreements as lawful. From its enactment in 1935 through ¹⁰⁴7, the National Labor Relations Board (NLRB) simply did not exercise jurisdiction over the construction industry, see S. Rep. No. 1509, 82nd Cong., 2d. Sess. 4 (1952), citing In re Brown and Root, Inc., 51 NLRB 820 (1943), and established labor relation practices in construction were left unregulated. After the 1947 Taft-Hartley amendments, however, the NLRB did assert jurisdiction and invalidated union recognition classes in construction pre-hire agreements on the theory that the unions has not demonstrated majority effort in a bargaining unit before obtaining recognition. See S. Rep. No. 1509, 82nd. 2d Sess. 4-5 (1952).

The resulting dislocation in the construction industry led both unions and employers to seek legislation validating their traditional collective bargaining practices. After several bills failed in the 1950's, Congress finally amended the NLRA in 1959 to re-establish customary labor relations practice in the construction industry.

Section 8 (f) of the NLRA now provides that:

> It shall not be an unfair labor practice under subsections (a) and (b) of the section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this Act prior to the making of such agreement. . . . Provided . . . that an agreement which would be invalid, but for clause (1) of this subsection, shall not be a ban to a [decertification] or deauthorization petition filed pursuant to section 9(c) or 9(e).

29 U.S.C. § 158 (f)(1988); see generally Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753 (1983).

Section 8 (e), also added that year, imposed an explicit ban on so-called "hot cargo" clauses, labor contract provisions where employers agree to cease doing business with any nonunion company, but then added the so-called "construction industry proviso:"

> [N]othing in this subsection (e) shall apply to an agreement between a labor organization and or employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.

29 U.S.C. § 158 (e)(1988); see generally, Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 102 S.Ct. 2071 (1982). Section 8 (e) therefore permits a general contractor's prehire agreement to require an employer not to hire other contractors to perform work on the project unless they agree to be bound by the terms of the labor agreement.

Therefore, there has been no question that private owner-developers may insist on project labor agreements as a specification when letting bids without running afoul of the N'.RA. Likewise, as the U.S. Supreme Court unanimously held this year in Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, 113 S.Ct. 1190 (1993), public owner-developers may do the same. As the Court explained:

> There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon the contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same.

Id. at 1198 (emphasis in original). Indeed, the Court went further, and suggested that any state regulation "denying an option to public owner-developers that is available to private owner-developers might itself be pre-empted by the NLRA." Id.

That possibility simply reenforces our opinion that local governments in Minnesota may include project labor agreement specifications in their offers for bids on construction projects without running afoul of state competitive bidding requirements, if such specifications are in that governments' economic interest as a purchaser of contracting services.

It may be important to identify what this opinion does not address. First of all, we do not address the propriety of any "union labor" requirements for anything other than public works construction projects. Second, we emphasize that any such requirement must be narrowly tailored to confine its impact to particular projects. Any project labor agreement requirement should specify that all contractors are eligible to compete for the work regardless of their labor practices elsewhere, as long as they agree to abide by the agreement's requirements while performing work on the project. Third, we do not suggest that local governments may insist on collective bargaining terms that would fall outside the exceptions described in sections 8(e) and 8(f) of the NLRA, e.g. not permitting a majority of the employees in the unit to decertify the union or deauthorize the checkoff of union dues. Finally, fourth, the economic justifications for the bid specification must be legitimate, and not a pretext for an effort to set general labor policy. Once a local government steps outside of its role as "market participant" and becomes a "regulator," any "union labor" requirement would face a strong NLRA preemption challenge.

With those qualifications, your question is therefore answered in the affirmative.

Very truly yours,

HUBERT H. HUMPHREY III
Attorney General