TORRUELLA, Circuit Judge
(dissenting).
I respectfully dissent from the disposition created by the separate opinions of my colleagues. It is plain to me, as it was plain to a majority of the Board below, that Haas committed unfair labor practices by unlawfully withdrawing recognition from a union and making unlawful changes to the terms and conditions of employment. Accordingly, the Board’s order should be enforced.
I.
I generally accept the facts and procedural history as they are recited in the two concurring opinions of Judge Stahl and Judge Lynch. My differences with my colleagues lie largely with their treatment of the Board’s legal determinations.
II.
Through its experience and specialized expertise, the Board has identified a common threat to stable multiemployer bargaining — i.e., that some employers attempt to “secure the best of two worlds by purportedly withdrawing bargaining authority but then remaining a member of a mul-tiemployer unit in the hope of securing advantageous terms through group negotiations.” Sheet Metal Workers’ Int’l Ass’n Local 19 v. Herre Bros., Inc., 201 F.3d 231, 244 (3d Cir.1999). Preventing such behavior is sound Board policy that holds true in the context of prehire agreements under § 8(f) of the Act, as well. Cf. Jim McNeff, Inc. v. Todd, 461 U.S. 260, 271, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983) (“Nothing in the legislative history of § 8(f) indicates Congress intended employers to obtain free the benefits of stable labor costs, labor peace, and the use of the union hiring hall.”).
In order to effectuate its policy, the Board has established a batch of rules, as set forth in Retail Associates, Inc., 120 N.L.R.B. 388, 1958 WL 13328 (1958), and subsequent decisions. According to these rules, the Board allows withdrawal from multiemployer bargaining prior to the initiation of negotiations only if the stated intent to withdraw is both timely and unequivocal.[1] Id. at 393-95. Subsequent *37 conduct on the part of an employer that is inconsistent with a stated intent to withdraw nullifies the employer’s withdrawal.[2] See Dependable Tile Co., 268 N.L.R.B. 1147, 1147, 1984 WL 36081 (1984), enforced sub nom., NLRB v. Hartman, 774 F.2d 1376 (9th Cir.1985). These rules have been consistently followed and have served the Board for over 40 years in promoting the purposes of the NLRA. See, e.g., Int’l Ladies’ Garment Workers’ Union, 286 N.L.R.B. 226, 231, 1987 WL 89961 (1987), enforced, 853 F.2d 918 (3d Cir.1988); Dependable Tile Co., 268 N.L.R.B. at 1147; Michael J. Bollinger Co., 252 N.L.R.B. 406, 407-08, 1980 WL 12429 (1980), enforced, 705 F.2d 444 (4th Cir.1983); Associated Shower Door Co., 205 N.L.R.B. 677, 682, 1973 WL 5179 (1973), enforced, 512 F.2d 230 (9th Cir.1975).
In the case at hand, the Board determined that the Retail Associates rules— which it has only had occasion to apply to the negotiation of new collective-bargaining agreements — apply with equal force to an employer who withdraws from multiem-ployer bargaining prior to the negotiation of an extension of an existing collective-bargaining agreement. This a predictable and logical application of the Board’s precedent because, for purposes of the Retail Associates rules, there is no principled reason for distinguishing between a new agreement and the extension of an existing one. Thus, the Board applied its rules to the facts of this case in a consistent manner. I see no unfairness that would arise from subjecting Haas to the Board’s extension of its precedent.
Unfortunately, in spite of the soundness of the Board’s policies and the reasonableness of the Board’s application of its rules to the case at hand, my colleagues deny enforcement of the Board’s order and, in so doing, depart from established rules governing the deference we owe the Board in its administration of the NLRA.
A. Our general duty to defer to the Board’s construction of the NLRA
It is well established that “we have traditionally accorded the Board deference with regard to its interpretation of the NLRA as long as its interpretation is rational and consistent with the statute.” NLRB v. United Food & Commercial Workers, Local 23, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1989); see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, a finding by the Board that the Act has been violated will be upheld “as long as the finding is supported by substantial evidence on the record as a whole, even if we would have reached a different conclusion.” 3-E Co., Inc. v. NLRB, 26 F.3d 1, 3 (1st Cir.1994) (citing 29 U.S.C. § 160(e)).
• Although the opinions of both my colleagues recount the appropriate standard of review, I see little in their analyses that actually comports with the standard’s deferential command. Both of them acknowledge that the legal issue before us is a close question that implicates a considered balancing of the parties’ legitimate interests. In my view, such admissions ought to signal deference to the Board’s ruling. *38 See Yesterday’s Children, Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir.1997) (“We may not substitute our judgment for the Board’s when the choice is ‘between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.’ ”) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Failure to defer to the Board’s ruling is especially inappropriate in the present context. As the Supreme Court has stated, the Board’s rules in this area “have evolved and are still evolving, as the Board, employing its expertise in the light of experience, has sought to balance the conflicting legitimate interests in pursuit of the national policy of promoting labor peace through strengthened collective bargaining.” Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 413, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (citations and internal quotation marks omitted).
By failing to observe settled principles of deference, my colleagues also commit a compounding error. That is, they embark on a hasty reevaluation of the labor policies animating the Board’s ruling, and their conclusions raise some troubling con-' cerns. I turn to those issues now.
B. Haas’s acceptance of the benefits of collective bargaining on a multiem-ployer basis
The Board found that Haas acted inconsistently with any earlier withdrawal from multiemployer bargaining by accepting the benefits of a quid-pro-quo negotiated between NECA and the Union whereby the Union would grant wage-rate and other concessions in exchange for the greater security of a longer contract. In spite of this sound reasoning, my colleagues reject the Board’s ruling and allow an employer to pick and choose among mid-term concessions negotiated by the multiemployer representative after the employer’s supposed withdrawal of the representative’s authority to act on its behalf.
Rather than promoting stable labor relations, this result creates an incentive for employers in a multiemployer unit to jump ship immediately after an agreement is reached. That way, the abandoning employers can take advantage of any concessions granted during the contract’s term while not being bound any of the concomitant responsibilities. My colleagues’ ruling thus creates a classic example of the “free rider” problem. See Richard A. Pos-ner, Economic Analysis of Laiv 55 (3d ed.1986).
Both of my colleagues articulate similar justifications for their conclusions. They both posit that, when Haas agreed to be bound by the terms negotiated by NECA for 1990-1993, part of what Haas bargained for was that it would not be standing alone and that the other employers in the association would have the same obligations as Haas.[3] This is curious reasoning in light of fact that, as things turns out, *39 Haas did not have the same obligations as other employers. Indeed, Haas gets the best deal of any employer: lower rates and no additional responsibilities.
Moreover, I have found no authority— and none is cited by either of my colleagues — standing for the proposition that an employer, by engaging in multiemployer negotiations, bargains for and receives an ongoing assurance that all employers in the multiemployer unit will be treated equally for the duration of the contract, regardless of whether that employer (or any other employer) withdraws from the group prior to the contract’s termination. And in the end, I doubt that my colleagues would want to go along with the true implications of their “standing together” reasoning. For instance, what if NECA had negotiated a rate increase after Haas’s withdrawal? My colleagues’ reasoning seems to compel the conclusion that Haas would have to accept the higher rates. Similarly, what if Haas had withdrawn and then successfully negotiated an even larger rate decrease in individual bargaining with the Union? Under my colleagues’ rationale, either Haas would be unable to take advantage of the better rates or, more dramatically, the decrease negotiated by Haas would be applied to all employers in the group. Clearly, these would be peculiar and unprecedented outcomes.
My colleagues also decry the catch-22 that would result if Haas were not permitted to behave opportunistically. I perceive no such problem. Having abandoned group bargaining, Haas was no longer concerned with maintaining parity with other contractors. And nothing prevented Haas from negotiating individually with the Union in an effort to gain concessions equal to or greater than those negotiated by NECA.
In their concern for Haas’s dilemma, my colleagues fail to appreciate the double bind their reasoning could inflict on both the Union and the employers remaining in the multiemployer unit. If withdrawing employers such as Haas are still able to take advantage of mid-term concessions, this will dramatically affect the Union’s bargaining position and impose substantial costs on the non-withdrawing employers. The Union, which has a duty to fairly represent all of its members, see Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), is placed in the difficult spot of making concessions on behalf of all members in exchange for benefits that accrue only to some members. Likewise, non-withdrawing employers will doubtlessly chafe at the prospect of shouldering a disproportionate share of the cost for concessions. My colleagues reasoning could also have further unintended consequences that are equally unsavory.
Although my colleagues express similar concerns, they differ as to how their labor-policy ruminations should affect the outcome of the case. Judge Stahl believes that Haas’s interests in “standing together” and in avoiding a potential catch-22 are dispostive. In other words, he believes that the Act mandates an outcome contrary to the Board’s ruling. Meanwhile, Judge Lynch believes that the Act might permit the Board’s ruling (provided the Board gives a more thorough account of its reasoning), but that the Board lacked the authority in this instance to enforce its ruling against Haas. In my view, my colleagues’ concerns are ill-founded, and the Board was fully justified in making its ruling. Precedent and experience make clear that our views on these issues should yield to those of the agency chosen by Congress to make sensitive labor policy judgments.
C. Haas’s failure to announce the nature of its presence at collective bargaining
Even if Haas’s acceptance of the benefits of the 1992 negotiations could not *40 support the Board’s ruling, additional evidence supports a finding that Haas’s inconsistent conduct nullified the stated intention to withdraw. Despite its earlier letters of withdrawal, Haas participated actively in the reopener negotiations without announcing any limitations on its authority to bargain. The Board has repeatedly held, with the approval of our sister circuits, that such unqualified participation in subsequent multiemployer bargaining will nullify an earlier expressed withdrawal. See Herre Bros., 201 F.3d at 247; Hartman, 774 F.2d at 1384; Michael J. Bollinger Co., 252 N.L.R.B. at 407; Associated Shower Door, 205 N.L.R.B. at 682. Based on this unbroken line of precedent and the evidence in this case, I believe the Board was more than justified in concluding that Haas had bound itself to the agreements.
My colleagues dismiss the significance of Haas’s failure to announce its supposedly limited role in negotiations by asserting that the Board’s rule is irrational and unnecessary in the present context. However, in light of the fact that Board precedent identifies a recurring problem of employers trying to hedge their bets with half-hearted withdrawals, I would defer to the Board’s experience in evaluating how this complex area of labor relations operates. The “stand and announce” rule has solid justification as a bulwark against slippery employer tactics. Furthermore, the rule promotes a degree of predictability that, when observed, obviates the need for cases such as this.
D. The disposition of the case
One final point bears attention. In his concurring opinion, Judge Stahl concludes that the Board’s ruling, no matter how thoroughly analyzed, violates the NLRA. Although I disagree with this underlying premise, it is sensible that he would decide to grant Haas’s petition and deny enforcement of the Board’s order. As I read Judge Lynch’s concurring opinion, however, she does not decide that the Board’s ruling was contrary to the Act. Overall, Judge Lynch is agnostic as to whether the Board could reasonably extend the rule of Retail Associates to the situation presented here. But in light of what is viewed as the poverty of the Board’s explanation for its actions, Judge Lynch concludes that the Board’s order cannot be enforced as its stands. Given the views expressed in the her opinion, I believe the appropriate step would be to remand the case to the Board for further explication of its holding. See Shaw’s Supermarkets, Inc. v. NLRB, 884 F.2d 34, 41 (1st Cir.1989). Instead, Judge Lynch votes to deny enforcement outright. I think this conclusion is erroneous as a matter of law.
In my view, denial of enforcement would be appropriate only if the Board’s legal ruling violates the Act or runs contrary to “reasonable private expectations existing at the time of the relevant conduct.” C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 358 (1st Cir.1990). But as both of my colleagues recognize, the Board simply took principles that are well established in one context (that of negotiating new agreements) and extended them to another context (that of a contract extension). Although we disagree as to whether such an extension is both supported and supportable, there is nothing that could give Haas a reasonable expectation that its conduct was lawful at the time. Thus, even if Judge Lynch is correct in concluding that the Board’s explanation for its action is inadequate, remand would clearly be the proper remedy. See Epilepsy Found. of N.E. Ohio v. NLRB, 268 F.3d 1095, 1102 (D.C.Cir.2002) (“[Retroactive effect is appropriate for new applications of [existing] law, clarifications, *41 and additions.” (citations and internal quotation marks omitted)).
III.
For these reasons, I would deny Haas’s petition for review and grant the Board’s cross-petition for enforcement. Since I believe my colleagues err in granting Haas’s petition, I respectfully dissent.

. Once negotiations have begun, an employer may only withdraw from negotiations with the union’s consent or upon a showing of "unusual circumstances.” Retail Assocs., 120 N.L.R.B. at 395. Although Judge Stahl remarks on Haas's dire financial situation, *37 Haas made no claim of "unusual circumstances" before the Board or this Court. Cf. Callier’s Custom Kitchens, 243 N.L.R.B. 1114, 1117, 1979 WL 9368 (1979) ("[U]nusual circumstances have been found to exist when the withdrawing employer can establish that it is faced with dire economic consequences, such as imminent bankruptcy.").

. I tend to agree with both of my colleagues that Haas adequately communicated its intention to withdraw from ÑECA. I depart with my colleagues on the question of whether Haas's subsequent inconsistent conduct nullified its withdrawal from multiemployer bargaining.

. This rationale is completely at odds with the views expressed by Haas to NECA and the Union. In its June 29, 1992, letter to the NECA and the Union, Haas stated: “Haas Electric does not agree to be bound by any revisions to the existing agreement dated July 1, 1990 between Western Massachusetts Chapter, NECA and [the Union].” Despite the fact that Haas decided to adopt several favorable contract terms negotiated by NECA, one can detect no indication in the letter that Haas felt that its own fate continued to be tied to that of NECA and its members. Indeed, in the same letter, Haas disingenuously claims to have been ignorant of the fact that contract negotiations had occurred, even though Haas had requested and attended the reopener negotiations. Judge Stahl’s opinion notes this inconsistency as “puzzling”; it strikes me as further compelling evidence of Haas's efforts to obtain the best of both worlds.