**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AMERICAN AUTOMATIC SPRINKLER
SYSTEMS, INCORPORATED,
Petitioner,

v.

No. 97-1821

NATIONAL LABOR RELATIONS BOARD,
Respondent,

ROAD SPRINKLER FITTERS LOCAL
UNION NO. 669, U.A., AFL-CIO,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

AMERICAN AUTOMATIC SPRINKLER

No. 97-2014

SYSTEMS, INCORPORATED,
Respondent,

ROAD SPRINKLER FITTERS LOCAL
UNION NO. 669, U.A., AFL-CIO,
Intervenor.

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(5-CA-24636)

Argued: September 23, 1998

Decided: December 17, 1998

Before WIDENER and LUTTIG, Circuit Judges, and MAGILL, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

_____

Petition granted in part and denied in part and cross-application for enforcement granted in part and denied in part by published opinion. Judge Luttig wrote the opinion, in which Judge Widener and Senior Judge Magill joined.

_____

**COUNSEL**

**ARGUED:** Lawrence Edward Dube, Jr., DUBE & GOODGAL, P.C., Baltimore, Maryland, for American Automatic. Steven B. Goldstein, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. William W. Osborne, Jr., OSBORNE LAW OFFICES, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Margaret Ann Gaines, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Marc D. Keffer, OSBORNE LAW OFFICES, P.C., Washington, D.C., for Intervenor.

_____

**OPINION**

LUTTIG, Circuit Judge:

Petitioner American Automatic Sprinkler Systems, Inc., petitions for review of a decision and order of the National Labor Relations Board concluding that American violated section 8(a)(1), (a)(3), and (a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (a)(3), and (a)(5), by, inter alia, failing to bargain in good faith with the union locals upon the expiration of collective-bargaining agreements, unilaterally changing working conditions, and discriminating against certain individuals on the basis of union membership. The NLRB cross-petitions for enforcement of its decision and order. For

2

the reasons that follow, we conclude that American did not have a legal obligation to negotiate with or recognize its collective-bargaining partners upon the expiration of their respective agreements, and thus did not violate section 8(a)(5) or (a)(1) by unilaterally changing the conditions of employment. However, because we conclude that the Board's findings of unlawful discrimination against union members in violation of section 8(a)(3) and (a)(1) are supported by substantial evidence in the record as a whole, we enforce the Board's order as to these findings. Accordingly, we grant in part and deny in part American's petition for review, grant in part and deny in part the Board's cross-petition for enforcement of its order, and remand the case to the NLRB for entry of an appropriate remedial order.

I.

American is an Owing Mills, Maryland, firm engaged in the fabrication, installation, and servicing of fire sprinkler systems. Road Sprinkler Fitters Local Union No. 669, U.A., A.F.L.-C.I.O. is a sprinkler fitters' union with near nationwide geographic jurisdiction. Road Sprinkler Fitters Local Union No. 536 has jurisdiction over Baltimore, Maryland, and surrounding areas.

Since it began operations in 1974, American has been a party to successive collective-bargaining agreements with Local 669 and Local 536 by virtue of its membership in a multiemployer bargaining association, the National Fire Sprinkler Association ("NFSA" or "the Association"). These negotiated collective-bargaining agreements established the terms and conditions of employment for American's journeymen and apprentice sprinkler fitter employees employed in the respective territorial jurisdictions of Locals 669 and 536.

In 1987, American signed a form recognition agreement acknowledging Local 669 as the exclusive bargaining representative of its sprinkler fitter employees working in Local 669's jurisdiction. The agreement, which was accompanied by fringe benefit forms demonstrating majority union membership, stated:

> [American] . . . has, on the basis of objective and reliable information, confirmed that a clear majority of the sprinkler

3

fitters in its employ have designated, are members of, and are represented by . . . Local 669 . . . for purposes of collective bargaining. [American] therefore unconditionally acknowledges and confirms that Local 669 is the exclusive bargaining representative of its sprinkler fitter employees pursuant to Section 9(a) of the National Labor Relations Act.

American signed another such recognition agreement with Local 669 in 1988 that stated as follows:

[American] hereby freely and unequivocally acknowledges that it has verified the Union's status as the exclusive bargaining representative of its employees pursuant to Section 9(a) of the National Labor Relations Act.

And, in 1991, NFSA, which was then American's bargaining representative, negotiated a collective-bargaining agreement with Local 669 that included a similar recognition clause. That agreement took effect April 1, 1991, and expired on March 31, 1994. NFSA also negotiated a collective-bargaining agreement on behalf of its members, including American, with Local 536. This agreement, which was effective from June 1, 1991, to May 31, 1994, included an identical recognition clause to that in the Local 669 agreement:

The National Fire Sprinkler Association for and on behalf of its contractor members . . . recognizes [Local 536] as the sole and exclusive bargaining representative for all journeymen sprinkler fitters and apprentices in the employ of said employers [working in the City of Baltimore and its 10 surrounding miles], . . . pursuant to section 9(a) of the National Labor Relations Act.

In late January, 1994, American notified both Local 669 and 536 that it was withdrawing bargaining authority from the NFSA and intended thereafter to bargain independently with the unions. Within days, Local 536 requested that the Company identify dates and times to bargain. The Company never responded to this initial communication or to three telephone messages to the same effect.

The Company eventually met with the Local on May 31, 1994, the day the NFSA agreement expired. At that time, however, the Company offered no proposal and filed the Local's proposal without reviewing it. The Company's Vice-President Mike McCusker submitted its first proposal to the Local on July 25, 1994. The proposal was less than a page long in its entirety, and, in addition to drastically cutting wages and benefits, it would have effectively eliminated union representation. The proposal included no recognition clause, no description of the bargaining unit, no contract term, and no provisions addressing dues check-off, union security, grievances and arbitration, overtime, or lunch time, holiday or vacation pay. The proposal required employees to furnish all of their own tools, irrespective of cost, created a new non-unit position of "helper," and eliminated the union apprenticeship program and territorial jurisdiction.

After three brief "bargaining sessions" in which the Company expressed no willingness to deviate in any way from its initial proposal, McCusker informed the union negotiating representative on August 9, 1994, that the parties were at an "impasse" because the union had rejected its "final offer." Further, McCusker indicated that the Company would begin implementing the terms of its proposal on August 11. When the union stated its wish to continue negotiations, the Company did not respond, and instead began implementing the terms of its proposal through negotiations with individual employees.

McCusker's negotiations with Local 669 proceeded in similar fashion. There were three negotiating sessions in which the Company expressed no willingness to compromise on its substantially identical proposal or even consider the Local's proposal. As occurred with Local 536, the sessions ended with the Company's abrupt declaration of impasse and its rejection of further entreaties by the union.

In the weeks following American's declarations of impasse, the Company required all employees to submit individual applications for work and entered into individualized negotiations. Executives of the Company told employees and union members that the Company was going "nonunion," and suggested that it would be able to give better offers to individuals who resigned their union cards. During this time period, one of the general contractors for whom the Company was

5

working as a subcontractor complained repeatedly that the Company was behind schedule due to labor shortages.

As a consequence of the Company's actions, Locals 669 and 536 and their individual members filed charges with the Regional Director of the NLRB, who in turn issued a series of complaints against the Company. The Administrative Law Judge to whom the complaints were referred found that the Company had violated section 8(a)(5) and (a)(1) of the NLRA by bargaining in bad faith with the Locals and prematurely declaring an impasse, bypassing both Locals and dealing directly with individual employees, and unilaterally making changes in mandatory subjects of bargaining and the scope of the bargaining units.[1] The ALJ further found that the Company had violated section 8(a)(1) of the NLRA by telling employees it was going "non-union," telling an employee that he could not work as a foreman because of his father's union affiliation, and impliedly promising an employee a wage increase if he resigned his union membership card. Finally, the ALJ found that the Company had violated section 8(a)(3) and (a)(1) of the Act by refusing to hire or reinstate, discharging and constructively discharging, and imposing onerous working conditions on, members of both Locals.

On appeal, the Board affirmed the conclusions of the ALJ, finding additional violations with respect to the treatment of certain individual employees. The Board ordered the Company to bargain with both Locals, rescind the unilateral changes, make employees and Locals' funds whole for any losses directly attributable to the Company's uni-

_____

[1] Section 8(a), 29 U.S.C. § 158(a), provides, in relevant part, as follows:

> It shall be an unfair labor practice for an employer--
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . ..
>
> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

lateral changes, offer certain individuals immediate employment in their former jobs, or to the jobs to which they would have been assigned, and make these individuals whole for any losses suffered as a result of the discrimination against them.

American petitions for review of the Board's findings and order, and the Board cross-petitions for enforcement of its order.

II.

A.

We consider first American's contention that it was not under a legal obligation to bargain collectively with Locals 669 and 536 and thus could not have violated section 8(a)(5) and (a)(1) of the Act by bargaining in bad faith and making unilateral changes in the conditions of employment.

An employer is obligated under section 8(a)(5) to bargain collectively with a union that has been "designated and selected for the purposes of collective bargaining by the majority of employees," pursuant to section 9(a) of the Act, 29 U.S.C. § 159(a). An employer who is party to an agreement with a union "designated and selected" in accordance with section 9(a) may not repudiate the contract during its term and may not refuse to bargain with the union following expiration of the contract, unless the employer proves either that a majority of its employees did not in fact support the union or that it doubted in good faith the union's majority status. NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 778 (1990); NLRB v. Gissell Packing Co., 395 U.S. 575, 597 n.11 (1969). Conversely, in the usual case it is an unfair labor practice under section 8(a)(1) and (2) for an employer, and section 8(b)(1)(A) for a union, to enter into a collective-bargaining agreement when only a minority of employees has "designated and selected" the union as its bargaining representative. See NLRB v. Local 103, Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers (Higdon), 434 U.S. 335, 344 (1978) ("There could be no clearer abridgment of § 7 of the Act, assuring employees the right `to bargain collectively through representatives of their own choosing' or `to refrain from' such activity than to grant exclusive bargaining status to an agency selected by a minority of its

7

employees, thereby impressing that agent upon the nonconsenting majority." (internal quotations and citation omitted)); Garment Workers v. NLRB, 366 U.S. 731, 737 (1961) (same).

Section 8(f) of the NLRA, 29 U.S.C. § 158(f), created an exception to this general prohibition. Enacted by Congress in 1959 to address problems unique to the building and construction trades, section 8(f) allows construction industry employers and unions to enter into "pre-hire" agreements before a majority of employees has approved the union as its bargaining representative.[2]

In John Deklewa & Sons, Inc., 282 NLRB 1375 (1987), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3rd Cir. 1988), the Board substantially modified its then-existing interpretation of section 8(f) and introduced new rules governing the relationship between parties to an 8(f) collective-bargaining agreement. Prior to Deklewa, the rights of employers and unions in 8(f) relationships were governed by the Board's decision in R.J. Smith Construction Co., 191 NLRB 693 (1971), enforcement denied sub nom. Local No. 150, Int'l Union of

_____

[2] Section 8(f) provides in relevant part:

> It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, . . .: Provided , That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

8

Operating Eng'rs v. NLRB, 480 F.2d 1186 (D.C. Cir. 1973), and the associated "conversion doctrine."

Pursuant to R.J. Smith, an 8(f) agreement "confer[red] no presumption of majority status" on the signatory union and could be repudiated at any time and for any reason by either party. Deklewa, 282 NLRB at 1378. Subsequent cases established, in reliance upon a suggestion by the Board in R.J. Smith that such might occur, that a conversion of an 8(f) relationship into a standard 9(a) relationship could be accomplished by a showing that the union had at some point during the term of the contract enjoyed majority support among an appropriate unit of the employer's employees. Id . This majority support, the reasoning went, could be established by proof of any of a number of objective evidentiary factors, the existence of which was typically quite burdensome to litigate. Id. Once the Board determined that conversion had occurred, the union was accorded "immediate and complete 9(a) status, and any collective-bargaining agreement in effect acquired the status of a collective-bargaining agreement enforceable before the Board." Id. at 1379. As with any other 9(a) relationship under the Act, the union would also enjoy a rebuttable presumption of majority status at the expiration of the contract, and the employer would be legally obligated under the NLRA to engage in good faith collective bargaining. Id.

In Deklewa, the Board abandoned R.J. Smith and the conversion doctrine, concluding that this analytical framework did "not fully square with either 8(f)'s legislative history" or text, "inadequately serve[d] the fundamental statutory objectives of employee free choice and labor relations stability," id. at 1380, and "entail[ed] evidentiary determinations that are inexact, impractical, and generally insufficient to support the conclusions they purport to demonstrate." Id. at 1384. In its place, the Board established a new framework for 8(f) relationships. The Board declared that an 8(f) agreement is binding and enforceable during the duration of the contract, and cannot be unilaterally repudiated by either party to the agreement, id. at 1385, but that, upon the contract's expiration, the signatory union will not enjoy a presumption of majority and either party may repudiate the 8(f) relationship, id. at 1386. Most significantly for our purposes today, the Board also announced that 8(f) representatives would no longer be able to establish "conversion" to 9(a) status except by means of a

9

Board-certified election, id. at 1383-85, or voluntary recognition based upon a clear showing of majority support. Id. at 1387 n.53.

Although the Supreme Court has yet to consider the Deklewa rules, a majority of the Courts of Appeals has done so and each, with the exception of our court, has ultimately adopted the Deklewa analytical framework in its entirety.[3]

In this court's only previous consideration of these"new" rules, we held last year, in Industrial Turnaround v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997), that we were "precluded from adopting Deklewa as the law of the Circuit because it stands in conflict with Clark v. Ryan, 818 F.2d 1102 (4th Cir. 1987), a prior panel opinion of this court." The question before us in Industrial Turnaround , however, was whether Deklewa effectively overruled the law of this circuit, established in Clark, that "a pre-hire agreement may be repudiated at any time by either party prior to the union's achievement of majority status." Industrial Turnaround, 115 F.3d at 254. Both Clark and Jim McNeff, Inc. v. Todd, 461 U.S. 260 (1983), the Supreme Court decision upon which Clark was based, likewise concluded only that "[a] § 8(f) prehire agreement is subject to repudiation until the union establishes majority status." McNeff, 461 U.S. at 271. None of these three decisions addressed the conversion doctrine at all, or, more broadly, the question of how an 8(f) union can obtain 9(a) representative status under the National Labor Relations Act. This question is thus one of first impression for this court. Accordingly, we are free

_____

[3] The Courts of Appeals for the First, Third, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all adopted the Deklewa decision. See NLRB v. Triple A Fire Protection, Inc., 136 F.3d 727, 735 (11th Cir. 1998); NLRB v. Viola Indus.-Elevator Div., Inc., 979 F.2d 1384, 1393-95 (10th Cir.) (en banc); C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 357 (1st Cir. 1990); NLRB v. Bufco Corp., 899 F.2d 608, 609, 611 (7th Cir. 1990); NLRB v. W.L. Miller Co., 871 F.2d 745, 748 (8th Cir. 1989); Mesa Verde Constr. Co.  v. Northern California Dist. Council of Laborers, 861 F.2d 1124, 1129-34 (9th Cir. 1988) (en banc); International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3rd Cir. 1988).

10

to adopt the Board's construction of the Act on this score, provided it is reasonable. Holly Farms Corp., 517 U.S. at 409.**4**

B.

The Board abandoned the conversion doctrine because it concluded that the rule fostered neither industry stability nor employee free choice. The Board was correct that labor relations stability in the construction industry was one of the primary objectives of the 1959 amendments to the NLRA. See McNeff, 461 U.S. at 266 (reviewing legislative history of the 1959 Amendments and concluding that Congress in enacting section 8(f) sought to address instability created by the "uniquely temporary, transitory and sometimes seasonal nature of much of the employment in the construction industry"); see also Higdon, 434 U.S. at 348-49 (discussing same history and concluding that section 8(f) "greatly convenienced unions and employers" by "accommodat[ing] the special circumstances in the construction industry"). Cf. Colgate-Palmolive-Peet Co. v. NLRB, 338 U.S. 355, 362 (1949) ("To achieve stability of labor relations was the primary objective of Congress in enacting the National Labor Relations Act."). We believe that it was self-evidently reasonable for the Board to conclude in 1987, after more than fifteen years of experience attempting to

_____

**4** We recognize that by adhering to our refusal in Industrial Turnaround to adopt the Board's position regarding unilateral repudiation, while at the same time embracing the Board's abandonment of the conversion doctrine, we would establish as the law of this Circuit a hybrid approach considered and rejected by the Board in Deklewa . Nonetheless, as we have explained, we are precluded from revisiting as a panel the Circuit's established precedent on the repudiation issue. And, in any event, as counsel for the Board explicitly stated at oral argument, this case does not require reconsideration of the rules governing an employer's unilateral repudiation of an 8(f) agreement during its term because the Board has not alleged any such action on the part of the Company. Thus, in this case we need only determine, as counsel persuasively urged, whether the Board's conclusions in Deklewa as to the means by which an 8(f) union can attain 9(a) status, thereby entitling it to "all the rights of a majority representative, including a presumption of majority support upon expiration of a collective bargaining agreement and the correlative duty to bargain with respect to a new contract," NLRB v. Triple A Fire Protection, Inc., 136 F.3d 727, 731 (11th Cir. 1998), are permissible.

11

implement and enforce the R.J. Smith rules, that the statutory aim of labor relations stability was frustrated by a rule pursuant to which "an effective conversion [could] take place, without notice, at virtually any time after the signing of an 8(f) agreement, but[where] it may take years of fractious litigation to establish whether conversion actually did occur." Deklewa, 282 NLRB at 1383. See also Mesa Verde Constr. Co. v. Northern California Dist. Council of Laborers, 861 F.2d at 1134 ("The [conversion] doctrine does not further industry stability. Its complex nature inevitably fosters litigation . . . to establish whether conversion ever took place, among whom, and at what time.").

At the same time, and perhaps most importantly, we believe that the Board also reasonably concluded that the conversion doctrine impeded the often competing statutory aim of protecting employee free choice by allowing proof of union membership to serve as an evidentiary proxy for union support, even where the very 8(f) agreement sought to be converted required union membership as a condition of employment. Id. at *12. Cf. Authorized Air Conditioning Co., Inc. v. NLRB, 606 F.2d 899, 906 (9th Cir. 1979) ("It is well established that union membership is not always an accurate barometer of union support."). The text and statutory framework of the NLRA offer considerable support for the conclusion that the conversion doctrine was simply incompatible with the legislative goal of preserving employee free choice. While the Amendments to the Act were undoubtedly motivated, in large part, by Congress' desire to ensure stability in the construction industry, Congress was nevertheless careful in enacting section 8(f) to preserve its longstanding statutory policy of advancing employee free choice. Cf. Higdon, 434 U.S. at 346 ("As for § 8(b)(7), which, along with § 8(f), was added in 1959, its major purpose was to implement one of the Act's principal goals -- to ensure that employees were free to make an uncoerced choice of bargaining agent."). As a result, Congress included in section 8(f) a proviso, the subsection's second, specifying that an 8(f) agreement may not act as a bar to employees' rights under section 9(c) and 9(e) to petition to "reject or change their collective-bargaining representative."[5]

_____

[5] The second proviso reads in full:

> Provided further: That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

12

Deklewa, at *10. Cf. Higdon, 434 U.S. at 344 (explaining the purpose of the second proviso by noting that although "[p]rivileging unions and employers to execute and observe pre-hire agreements in an effort to accommodate the special circumstances in the construction industry may have greatly convenienced unions and employers, . . . in no sense can it be portrayed as an expression of the employees' organizational wishes"). The conversion doctrine flouted the legislative purpose -- and language -- of the second proviso by allowing even instantaneous conversions (i.e., where the signing of an 8(f) agreement was accompanied by an existing majority employee complement) to result in full 9(a) status and the attendant "contract bar" to election challenge. See NLRB v. Dominick's Finer Foods, Inc., 28 F.3d 678, 683 (7th Cir. 1994) ("Under the [contract bar] rule, a collective bargaining agreement protects an existing bargaining relationship from challenge for the contract term. . . . This rule was formulated by the Board in an effort to reconcile the NLRA's goals of promoting industrial stability and employee freedom of choice." (internal quotations and citation omitted)). Especially given that the conversion doctrine rendered the proviso's explicit language "nugatory," Deklewa, 282 NLRB at 1383, we think it was eminently reasonable for the Board to abandon the doctrine, which as the Ninth Circuit has explained "[r]ather than protect[ing] the free choice of employees to choose or reject a union, . . . often prevent[ed] them from ever voting for or against a particular" representative. Mesa Verde, 861 F.2d at 113.

Even as it jettisoned the conversion doctrine, the Board in Deklewa concluded that construction industry unions should not be disfavored in their ability to obtain the full protections-- and presumptions -- of the Act. Accordingly, the Board established that 8(f) unions, like their counterparts in nonconstruction industries, would not be precluded from achieving 9(a) status through either Board-certified election or voluntary recognition based upon a clear showing of majority support. Deklewa, 282 NLRB at 1387 n.53. Here, too, we believe that the Board's construction of the Act as it pertains to the ability of construction industry employees to choose their own collective-bargaining representatives is a defensible one. There is nothing in either the text or the statutory framework of the Act that purports to limit in any way the rights of employees in the construction industry to designate and select their own bargaining representatives pursuant

13

to section 9(a). The Board has long recognized that construction industry unions could obtain exclusive representative status before entering into a collective-bargaining agreement through the traditional means of Board-certified election or "by other voluntary designation, pursuant to Section 9(a)." Island Const. Co. , 135 NLRB 13 (1962). And, again, the text of 8(f), which in its second proviso protects the right of employees subject to an 8(f) agreement to reject or change their bargaining representatives through the Act's petition processes, supports the conclusion that Congress meant to preserve employee free choice in the construction industry, as elsewhere. This interpretation of the section's text also finds support in the Supreme Court's acknowledgment in Higdon that a union party to an 8(f) agreement retained the ability to obtain full 9(a) representative status. Higdon, 434 U.S. at 349-50 (stating that "[i]t is . .. undisputed that when the union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit") (emphasis added)). Even at the time of the Supreme Court's decision in Higdon, it had long been established that a union could "successfully seek[ ] majority support" -- and thus attain 9(a) representative status -- not only through a Board-certified election, but also by means of voluntary recognition based on a clear showing of majority support. See, e.g., NLRB v. Gissell Packing Co., 395 U.S. 575 (1969); United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 71 (1956).

Similarly, nothing in the legislative history of the Act can be read to suggest that Congress intended in any way to disadvantage construction industry employees in their attempts to organize or bargain collectively. In fact, Congress was in part motivated by concern that "construction industry unions often would not be able to establish majority support with respect to many bargaining units." McNeff, 461 U.S. at 266. See also Higdon, 434 U.S. at 345 (reviewing the legislative history of section 8(f) and concluding that"[t]he Senate Report also noted that `[r]epresentational elections in a large segment of the industry are not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers'" (citation omitted)). It is certainly reasonable to conclude that Congress, in attempting to enable construction industry employees to reap the benefits of collective-bargaining, did not at the same time intend to strip

14

those employees of the full protections of the Act where they <u>were</u> "able to establish majority support." Thus, the Board's construction of the Act conforms to both its text and legislative history, as well as to Supreme Court <u>dicta</u> interpreting the same.

Because we agree with the Board that the conversion doctrine impeded the Act's principal aim of advancing employee free choice, and because we can discern nothing in either the text or legislative history of the 1959 amendments or, for that matter, the statutory framework of the Act, to suggest that employees in the construction industry should in any way be disfavored in their ability to secure union representation or the Act's protections, we accept as reasonable and adopt the Board's interpretation that 8(f) unions can attain full 9(a) status only through the traditional means available to unions in nonconstruction industries.

C.

Because the Board does not argue that either Local 669 or 536 attained 9(a) status through a certified election, we turn therefore to the question whether either satisfied the requirements for attaining such exclusive representative status through voluntary recognition.**6**

_____

**6** The Board argues that American's challenge to the Locals' 9(a) status is time-barred because it occurs more than six months after voluntary recognition was granted. In <u>Casale Indus.</u>, 311 NLRB 951, 953 (1993), the Board held that "a challenge to majority status must be made within a reasonable period of time after Section 9(a) recognition is granted." The Board based its ruling in <u>Casale</u> on the language of section 10(b), 29 U.S.C. § 160(b), "that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board," the fact that in cases involving nonconstruction industries, the Board will not entertain a claim that majority status was lacking at the time of recognition if more than six months have elapsed, <u>Casale</u>, 311 NLRB at 953, and its conclusion in <u>Deklewa</u> that "unions in the construction industry should not be treated less favorably than those in nonconstruction industries." <u>Id</u>. American counters that under the NLRA, only the General Counsel of the Board can issue "complaints," and that 10(b) can therefore only bar untimely complaints filed <u>by the Board</u>.

15

In considering claims of "conversion" through voluntary recognition, both the Board and reviewing courts have required "the union's

_____

American is correct that the two controlling authorities on which intervenor Local 669 primarily relies, Lodge No. 1424 v. NLRB (Bryan Mfg.), 362 U.S. 411 (1960), and NLRB v. Harvey Hubble, Inc., 783 F.2d 1121 (4th Cir. 1986), involved application of the six-month time bar to complaints filed by the General Counsel. Anticipating this objection, Local 669 claims additional support from the decisions of the Courts of Appeals for the Tenth and Eleventh Circuits applying the Casale rule to bar construction industry employer defenses to refusal-to-bargain charges. See National Labor Relations Board v. Triple A Fire Protection, 136 F.3d 727, 737 (11th Cir. 1998); MFP Fire Protection, Inc. v. NLRB, 101 F.3d 1341 (10th Cir. 1996). See also NLRB v. Viola Industries-Elevator Div., 979 F.2d 1384, 1387 (10th Cir. 1992) (applying the 10(b) time bar to an employer's affirmative defense that its grant of voluntary recognition was the product of unlawful coercion).

It is not immediately clear to us that the Board's rule applying the 10(b) time-bar to nonconstruction industry employer defenses of invalid voluntary recognition is a reasonable construction of a provision that, on its face, applies only to complaints filed by the Board. However, we need not decide that question today. Even assuming, arguendo, that the rule as applied to employers in nonconstruction industries is reasonable, we find that it is not so in the construction industry context. As one Board member recognized in Triple A Fire Protection, Inc., 312 NLRB 1088, 1089 n.3 (1993), "the basis for applying a 10(b) limitations period in the nonconstruction industry workplace, where minority recognition is unlawful, does not hold in the construction industry, where there is no statutory prohibition on minority recognition." Id. at *2 n.3. Thus, in the nonconstruction industries, a defense of invalid voluntary recognition is tantamount to a charge of unlawful conduct under the NLRA provisions prohibiting employers and nonmajority unions from entering into collective-bargaining agreements. This is not the case in the construction industry, where 8(f) itself establishes the legality of such relationships.

The Board's single sentence in Deklewa that "nothing in this opinion is meant to suggest that unions have less favored status with respect to construction industry employers than . . . those outside the construction industry," Deklewa, 282 NLRB at 1387 n.53, cannot suffice as a response to this critical distinction. The Board itself recognized as much shortly after Deklewa, when it held that it had not in that case upset the

16

unequivocal demand for, and the employer's unequivocal grant of, voluntary recognition as the employees' collective-bargaining representative based on the union's contemporaneous showing of majority employee support." NLRB v. Goodless Elec. Co., Inc., 124 F.3d 322, 324 (1st Cir. 1997) (citing James Julian, Inc. , 310 NLRB 1247, 1252 (1993)); see also Brannan Sand & Gravel Co., 289 NLRB 977, 979-80 (1988); J & R Tile, Inc., 291 NLRB 1034 (1988); American Thoro-Clean, 283 NLRB 1107, 1108-09 (1987). The Board has required that the demand for and grant of voluntary recognition be unequivocal because of the potential for confusion in the construction industry over which type of relationship -- 8(f) or 9(a)-- the parties intended to create by entering into the collective-bargaining agreement. The requirement of a contemporaneous showing of majority support, on the other hand, is not unique to the construction industry, and is consistent with the standard for voluntary recognition in the non-construction trades. See, e.g., NLRB v. Lyon & Ryan Ford, Inc., 647 F.2d 745, 751 (7th Cir. 1981) ("The essence of voluntary recognition is the commitment of the employer to bargain upon some demonstrable showing of majority (status)." (citation and quotation marks omitted)); Georgetown Hotel v. NLRB, 835 F.2d 1467, 1470 (D.C. Cir. 1987) ("[V]oluntary recognition has been found to have occurred when an employer agrees to recognize a union through a card check or some other procedure and subsequently confirms the union's majority status through that procedure.").

We reverse the Board's finding of an effective voluntary recognition of Local 669's 9(a) status because we believe that that finding

_____

rule of R.J. Smith that nothing in 10(b) or Bryan Mfg. "precludes inquiry into the establishment of construction industry bargaining relationships outside the 10(b) period . . . [where] [g]oing back to the beginning of the parties' relationship here simply seeks to determine the majority or non-majority based nature of the current relationship." Brannan Sand & Gravel Co., 289 NLRB 977, 982 (1988). Recent decisions of the Board and of the Tenth and Eleventh Circuits to the contrary notwithstanding, we do not believe that section 10(b) can reasonably be interpreted to prohibit American, the party against whom the complaint has been filed, from defending itself by challenging the validity of the evidence of effective voluntary recognition that is the basis of the Board's complaint.

17

was based on an unreasonable construction of the Act. In support of its concededly clear and unequivocal initial demand for voluntary recognition, Local 669 included fringe benefit reports demonstrating that a majority of the Company's employees in the relevant jurisdiction were members of the Local. American contends, however, that these fringe benefit forms cannot suffice to satisfy the requirement of a contemporaneous showing of majority support because the parties' 8(f) contract included a standard union security clause <u>requiring</u> employees, as a condition of employment, to join the union within seven days of being hired. Where a union security clause is in effect, petitioner argues, an employee's obligatory <u>membership</u> in the local cannot be equated with -- and certainly cannot be taken as dispositive of -- <u>support</u> for the union. We agree.

Prior to its decision in <u>Deklewa</u>, the presence of a strictly-enforced union security clause in an 8(f) contract was one of the evidentiary factors the Board often cited as proof of conversion to 9(a) status. <u>See</u> <u>Deklewa</u>, 282 NLRB at 1378. Even before <u>Deklewa</u>, however, at least one court of appeals had determined that majority union membership pursuant to an enforced union security clause was insufficient as a matter of law to establish effective conversion. <u>Precision Striping, Inc.</u> v. <u>NLRB</u>, 642 F.2d 1144, 1148 (9th Cir. 1981) (noting that "[a] union security clause operates to compel new employees to join the union, because union membership is the price for obtaining a job," and that "it is well established that union membership is not always an accurate barometer of union support" (internal quotations and citations omitted)). In <u>Deklewa</u> itself, the Board not only recognized the unreliability of union membership as a proxy for union support where a security clause is in effect, but in fact based its decision to <u>abandon</u> the conversion doctrine in part on the "highly questionable" nature of just such an inference. <u>Deklewa</u>, 282 NLRB at 1384.

The Board's reluctance in <u>Deklewa</u> to permit a union to obtain 9(a) status on the basis of such questionable evidence of majority support rested on its commitment, and that of Congress, to the protection and advancement of employees' free choice in designating and selecting their bargaining representatives. <u>Id</u>. at 1383. The Board observed in <u>Deklewa</u> that, by declaring in the second proviso of section 8(f) that a pre-hire agreement "shall not be a bar to a petition filed pursuant to section 9(c) or 9(e)," 29 U.S.C. § 158(f), "Congress sought to

18

assure that the rights and privileges accorded employers and unions in the body of Section 8(f) would not operate to thwart or undermine construction industry employees' representational desires." Deklewa, 282 NLRB at 1381. Yet the Board now concludes that the same statutory objective of employee free choice that justified its abandonment of the conversion doctrine is satisfied by the employer's voluntary recognition of the union on the basis of the very same evidentiary factor the Board rejected as insufficient in Deklewa. This construction of the Act simply is not rational. See Precision Striping, 642 F.2d at 1148. The effect of the Board's construction would be to allow non-majority unions to enter into 8(f) collective-bargaining agreements containing union security clauses and then bootstrap themselves, within a matter of days and with the complicity of the employer, into the full 9(a) status reserved under the Act for representatives that have in fact secured and demonstrated majority support. As the Board recognized in Deklewa, such 9(a) status entails an irrebuttable presumption of majority status during the contract's term that, under Board rules, bars the very election petitions 8(f)'s second proviso explicitly contemplates. Consistent with the Board's own logic in Deklewa, we cannot conclude that an interpretation of 8(f) is reasonable that "effectively renders [its] second proviso nugatory." Deklewa, 282 NLRB at 1382. As the Board observed in that case, "[s]uch [a] rule[ ] hardly advance[s] the objective of employee free choice."**7** Id.

_____

**7** The Board's decision to credit American's voluntary recognition of the union's majority status based upon fringe benefit reports showing majority membership is not only an unreasonable interpretation of the NLRA, it is inconsistent with the rationale the Board provided in Deklewa for allowing voluntary recognition of 9(a) status in the 8(f) context at all. The Board stated in Deklewa that, in permitting construction unions to achieve 9(a) status through voluntary recognition based on a clear showing of majority support among the unit employees, it intended simply to guarantee that these unions would not have"less favored status" under the NLRA than those in nonconstruction industries. Deklewa, 282 NLRB at 1387 n.53. However, the rule established by the Board in this case would in fact elevate construction unions to a privileged position vis-a-vis nonconstruction unions with regard to their ability to achieve 9(a) recognition and protection. That is, it is only by virtue of the 8(f) exception that construction unions which have not yet established majority status are permitted not only to enter into collective-bargaining

19

As for Local 536, we conclude that there was not substantial evidence in the record to support the Board's conclusion that the relationship between the NFSA -- and therefore American -- and Local 536 ever attained 9(a) status. The Board rested its affirmance of the ALJ's finding of 9(a) status through voluntary recognition on two pieces of evidence in the record. First, the Board pointed to American's assent to language in its multi-employer bargaining representative's contract with the Local recognizing it "as the sole and exclusive bargaining representative for all journeymen sprinkler fitters . . . in the employ of said employers, . . . pursuant to section 9(a) of the National Labor Relations Act." Second, the Board relied upon testimony that the union, in negotiating its 1991 collective-bargaining agreement, asked the Association whether there was any dispute that the Local "represented a majority of the employees," and received a negative reply. American Automatic Sprinkler Systems, Inc., 323 NLRB No. 160 (1997), 1997 WL 436748, at *1 (N.L.R.B.).

As an initial matter, the language to which the employer concededly consented in the multiemployer collective-bargaining agreement is conclusory, and evidences neither an "unequivocal demand for" nor "unequivocal grant of" voluntary recognition based upon a contemporaneous showing of majority support. In fact, the form does not even purport to establish recognition of the local as the majority representative, but rather only as the "sole and exclusive" representative. The Board's reliance on "the uncontradicted evidence . . . that during 1991 negotiations for article 3, Local 536 specifically asked the Association

_____

agreements, but to include union security clauses in those agreements. 29 U.S.C. § 158(f). In the nonconstruction industries, it has long been a violation of the Act for unions and employers to include such clauses in their agreements before majority support is established. Bryan Mfg., 362 U.S. at 413 ("[I]t is an unfair labor practice for an employer and a labor organization to enter into a collective-bargaining agreement which contains a union security clause, if at the time of original execution the union does not represent a majority of the employees in the unit."). Because voluntary recognition in both construction and nonconstruction industries must be based on an actual showing of majority support, acceptance of union membership pursuant to a union security clause as determinative of such support would give 8(f) unions a considerable advantage over their nonconstruction counterparts in attaining full 9(a) status.

20

whether there was any dispute that it represented a <u>majority</u> of the employees . . . [and] [t]he Association responded that there was no dispute," <u>id</u>. (emphasis added), is equally unavailing. The "uncontradicted evidence" to which the Board refers is union negotiator Roy Fique's testimony about his 1991 negotiations with the NFSA. That testimony read literally, however, supports a proposition directly at odds with the one the Board advances. Mr. Fique characterized the exchange between himself and bargaining representatives of the NFSA as follows:

> So in bargaining, I brought that up, is there any dispute that we are, you know, the representative of the employees, and everybody at the table agreed that there was <u>no doubt</u> in their mind that we represented the <u>minority</u> of employees.

J.A. at 438 (testimony of Roy Fique) (emphases added). It may be that this was either a misstatement by Fique or a transcription error. However, this statement, which on its face is an assertion of unanimous and unequivocal agreement as to the Local's <u>minority</u> status, is literally the only evidence with which we have been presented that supports a conclusion that the union unequivocally demanded and received recognition as the <u>majority</u> representative. When not even the parties themselves are in a position to represent that this statement was a misstatement or transcription error, and neither the ALJ nor the Board ever addressed the apparent discrepancy, we simply cannot conclude that, without more, it can suffice as a union's "unequivocal demand for" and the employer's "unequivocal grant of" voluntary recognition of majority status.

As for the requirement of a "contemporaneous showing of majority support," there is simply no evidence at all in the record to support a finding that it has been satisfied. Again, the Board can cite only the exchange between Fique and the NFSA negotiators. Even were the Board's characterization of Fique's testimony accurate, this conversation, while perhaps probative of the Company's <u>willingness</u> to recognize the union as the majority representative, does not support the suggestion that its grant of voluntary recognition was based, in fact, upon any showing of majority support, contemporaneous or otherwise. Fique's unsubstantiated request for recognition as the "major-

21

ity" representative, so understood, cannot be transformed into the required substantiation itself.

The Board's willingness to credit the employer's voluntary recognition absent any contemporaneous showing of majority support would reduce this time-honored alternative to Board-certified election to a hollow form which, though providing the contracting parties stability and repose, would offer scant protection of the employee free choice that is a central aim of the Act. Cf. Higdon, 434 U.S. at 349 ("Privileging unions and employers to execute and observe pre-hire agreements in an effort to accommodate the special circumstances in the construction industry may have greatly convenienced unions and employers, but in no sense can it be portrayed as an expression of the employees' organizational wishes."). In considering the Board's finding on this issue, we must concur with the Board's General Counsel that,

> [e]ven if the union does, in fact, represent a majority of the Employer's employees, . . . there must be explicit proof presented contemporaneously with the Union's demand and the Employer's voluntary recognition. Thus, although the Employer's ambiguous statements arguably may indicate that it believed the Union had majority support, those statements are insufficient to confer 9(a) status upon the Union without actual demonstration of that majority status.

Advice Ltr. from NLRB Gen. Counsel to Regional Director of Region 9, Feb. 27, 1989, 1989 WL 241614, at *2. (Feb. 27, 1989).

Accordingly, because we cannot conclude, consistent with the principles outlined a decade ago by the Board in Deklewa and accepted by us today, that petitioner had an obligation under the Act to bargain with either Local 669 or 536 upon the expiration of their respective multiemployer agreements, we grant American's petition for review as to the findings that it violated 8(a)(5) and (a)(1) by failing to bargain in good faith, unilaterally changing terms and conditions of employment, and dealing directly with employees.

III.

Our holding above that the employer had no statutory obligation to refrain from making unilateral changes to the conditions of employ-

22

ment disposes of the Board's findings of constructive discharge. Because each of these findings was premised on an employee resignation resulting from the employer's assertedly unlawful change to the conditions of employment, our conclusion that those changes were in fact lawful negates these findings completely. Accordingly, we grant American's petition for review of the Board's findings of constructive discharge. Finally, we deny American's petition for review with respect to the Board's findings of section 8(a)(3) and (a)(1) violations arising out of the discriminatory discharges, refusals to hire and reinstate, and imposition of onerous working conditions. There is ample record evidence of American's anti-union animus and its efforts to rid its workforce of active union members, despite those individuals' demonstrated qualifications and in the face of repeated contractor complaints about American's unsatisfactory job performance on account of labor shortages. Based upon a careful review of the record, we conclude that there was substantial evidence, particularly in light of the deference due the ALJ's credibility determinations, to support each finding of a section 8(a)(3) and (a)(1) violation as a result of a discriminatory discharge, refusal to hire or reinstate, or imposition of onerous working conditions.

CONCLUSION

For the foregoing reasons, we grant in part and deny in part American's petition for review of the Board's findings and order, grant in part and deny in part the Board's cross-petition for enforcement of its order, and remand for a remedial order consistent with this opinion.

IT IS SO ORDERED.

23